No. 17          February 3, 2021          399

## IN THE OREGON TAX COURT
## REGULAR DIVISION

### FARMERS DIRECT, INC.,
*Plaintiff,*

*v.*

### DEPARTMENT OF REVENUE,
*Defendant.*

(TC 5328)

On a motion for summary judgment, the Department of Revenue (Defendant) argued that a hay-bailing compression machine was "affixed to" or "erected upon" the land, making it real property. In response, Farmers Direct, Inc., (Plaintiff) the owner of the machine, argued that it was "movable" machinery or equipment that constituted tangible personal property and was therefore exempt from property tax under ORS 307.394(1). In order to qualify for an exemption under ORS 307.394(1), an item must be (1) "tangible personal property," (2) "farm machinery or equipment," (3) used primarily for a listed purpose, and (4) generally "moved or movable in the ordinary course of business." ORS 307.394; *Saunders v. Dept. of Rev.*, 300 Or 384, 390, 711 P2d 961 (1985). The court found that the stipulated facts and exhibits submitted by the parties did not provide a sufficient basis to determine whether the machine was "tangible personal property" or "moveable in the ordinary course of business." The court specifically cautioned against concluding that a machine or other item automatically becomes real property when bolted to real property. Therefore, Defendant's motion for summary judgment was denied.

Oral argument on Defendant's motion for summary judgment was held August 6, 2019, in the courtroom of the Oregon Tax Court, Salem.

Kristen M. Gallino, Assistant Attorney General, Department of Justice, Salem, filed the motion for Defendant Department of Revenue.

Connor J. Harrington, Kevin L. Mannix PC, Salem, filed the response for Plaintiff.

Decision rendered February 3, 2021.

**ROBERT T. MANICKE, Judge.**

### I.   INTRODUCTION

Plaintiff (taxpayer) uses a Steffen Systems Model 4600SP Big Bale Compression System (the Compression System) in its business of compressing bales of hay and straw for shipping. Taxpayer seeks exemption from property

tax for the Compression System under ORS 307.394(1) for tax years 2016-17 and 2017-18.[1] Taxpayer appeals from an adverse decision from the Magistrate Division. Defendant Department of Revenue (department) has filed a motion for summary judgment, which taxpayer resists.

The court will deny the department's motion. Although the parties have helpfully stipulated to numerous facts and have provided other documentary and graphic evidence, those presentations leave factual gaps because they are based in part on legal theories that the court concludes conflict with governing law. To apply the governing statutes as the court construes them, the court will set the case for trial, preferably after an opportunity to view the Compression System pursuant to Tax Court Rule (TCR) 56 E. As part of the analysis in this order, the court identifies additional areas of factual development that may be relevant.

## II.   FACTS

The parties have stipulated to a number of facts and have submitted 11 pages of stipulated photographs and three videos showing the Compression System in operation. In addition, taxpayer has submitted three declarations from an owner and two employees. Solely for purposes of its motion, the department does not dispute the facts alleged in taxpayer's declarations.

Taxpayer is in the business of compressing bales of hay and straw sourced from the individuals who own taxpayer and from other farms. Taxpayer uses the Compression System to compress the large bales produced at the farms into smaller, much denser, bales to facilitate shipment overseas. The Compression System takes up approximately 1,372.2 square feet of space and is housed in a pole barn that taxpayer leases in Yamhill County. The Compression System includes the following main components: an infeed system, a main press, an outfeed system, hydraulic and electric power units, and a control system. Hay and straw bales are initially placed into the infeed system which can hold up to 12 big bales and which severs the bales in two. The main

---

[1]  All references to the Oregon Revised Statutes (ORS) are to the 2015 edition unless otherwise indicated.

press compresses the bales lengthwise. The bales are then wrapped for shipment.

To prevent the Compression System from moving during operation, (1) the infeed and outfeed systems and the main press are bolted together; and (2) most of the Compression System is bolted to the concrete floor.

The Compression System obtains the hydraulic pressure it requires through 20 separate hydraulic hose connections. The parties supplied photographs captioned "Hydraulic plumbing" or "Hydraulic pump." The department characterizes the hydraulic system as "extensive" and asserts that the Compression System is "hard plumbed into the hydraulic system of the barn." Taxpayer supplied a declaration of its General Manager stating that the hydraulic hoses can be disconnected quickly using basic tools. Taxpayer asserts that, after being disconnected from the Compression System, the hydraulic "component" can be moved as one unit, using skids already attached to its underside.

The Compression System is connected to an electrical power unit that is bolted to the floor and is "hardwired" to a power panel that is attached to a wall. Taxpayer's office manager submitted a declaration stating that this panel is a dedicated unit that is separate from the panel that powers the barn lights and barn electricity. A transformer located outside the barn was installed to support electrical power needed for the Compression System and for the barn generally. The parties supplied photographs captioned "Electrical panel that services hydraulic pump and compression machine," "Electrical panel interior," and "Hard-wiring in electrical conduit," as well as two photographs of the transformer. The department characterizes the electrical system as "expansive" and the electrical panel as "large," and the department states that there are "electrical lines running from the[] [transformer] to the panel inside the barn, in order to accommodate the electrical needs of the Compression System." Taxpayer objects to the department's use of the terms "large" and "expansive"; taxpayer seeks to prove at trial that the power panel is a component of the Compression System which will be moved with it.

Although it took taxpayer three to four weeks to install the Compression System, the parties stipulate that it could be installed at its current location in a couple of days.[2] To move the Compression System from its current location, the hydraulic and electrical components must be disconnected, and bolts connecting components together and connecting the Compression System to the floor must be removed. Taxpayer's General Manager testified that his crew would "shear off" the bolts connecting the feet of the Compression System to the floor so that holes are not left behind. Disassembling the various components requires "an impact gun and other basic tools, a couple of forklifts, trucks and trailers, and *** a basic working knowledge of how to use such tools and equipment." The parties have stipulated that the Compression System could be disassembled and moved "in a day or less." Taxpayer's General Manager has estimated that it will take one to two days to disassemble, move, and reassemble the Compression System at a new location, using about six people, the two forklifts already in use for taxpayer's operations, and a truck with a flat-bed trailer system. Taxpayer has not moved the Compression System since acquiring it, other than to remove the stacking system from the outfeed system component. The parties have not identified what features or improvements would be required at a new site before the Compression System could be installed.

### III.   LEGAL BACKGROUND

ORS 307.394 exempts from property tax tangible personal property constituting farm machinery and equipment used for certain purposes:

"(1)   The following tangible personal property is exempt from ad valorem property taxation:

"(a)   Farm machinery and equipment used primarily in the preparation of land, planting, raising, cultivating, irrigating, harvesting or placing in storage of farm crops;

"(b)   Farm machinery and equipment used primarily for the purpose of feeding, breeding, management and sale

---

[2] The parties stipulate that manufacturing delays prolonged installation.

of, or the produce of, livestock, poultry, fur-bearing animals or bees or for dairying and the sale of dairy products;

"(c) Machinery and equipment used primarily to implement a remediation plan as defined in ORS 308A.053 for the period of time for which the remediation plan is certified; or

"(d) Farm machinery and equipment used primarily in any other agricultural or horticultural use or animal husbandry or any combination of these activities."

The statute thus requires an exempt item to be (1) "tangible personal property," (2) "farm machinery and equipment,"[3] and (3) used primarily for one of the purposes listed in ORS 307.394. Case law adds a fourth requirement, as discussed below, that the item be "generally * * * moved or movable in the ordinary course of business." *See Saunders v. Dept. of Rev.*, 300 Or 384, 390, 711 P2d 961 (1985).[4]

Most of the parties' arguments relate to the first requirement, that an item be "tangible personal property."[5] Oregon classifies locally assessed property such as the Compression System as either "personal property" or "real property."[6] *See* ORS 307.020 (defining "personal property"); ORS 307.010 (defining "real property"). Personal property is either "tangible personal property" or "intangible personal property," but of the two, only "tangible personal property" is subject to assessment and taxation. *See* ORS 307.010(1) (definitions); ORS 307.030(2) (intangible personal property not

---

[3] Neither party asserts that the Compression System is "[m]achinery and equipment used primarily to implement a remediation plan" as specified in paragraph (c) of ORS 307.394(1).

[4] The court also phrased the fourth requirement as requiring the item to be "designed to be moved in the ordinary course of business." *Id.*

[5] The department states that it has limited its motion by challenging solely taxpayer's position that the Compression System is "tangible personal property." However, both parties also discuss the "ordinary course of business" requirement articulated in *Saunders*, and the court treats that requirement as included in the scope of the department's motion.

[6] Most property, including the Compression System, is assessed "locally" by a county assessor; the definitions analyzed in this case apply to locally assessed property. By contrast, property used in certain utility, transportation, and other businesses listed in ORS 308.515(1) is assessed "centrally" by the department, and a different set of definitions applies to centrally assessed property. *See, e.g.*, ORS 308.505(14) (defining "property" for purposes of central assessment).

subject to assessment or taxation unless centrally assessed). Neither party asserts that the Compression System includes any intangible personal property; therefore, the choice in this case is binary: the Compression System is either "tangible personal property" or "real property."

The department argues that the Compression System is "real property" and therefore not "tangible personal property." The court follows that sequence in its analysis, in part because the statutory definition of "real property" is the older of the two and thus is part of the context in which the legislature defined "tangible personal property." As of the tax years at issue in this case, ORS 307.010(1)(b)(B) defines "real property," in relevant part, as follows:

> "'Real property' includes *** [a]ll buildings, structures, improvements, machinery, equipment or fixtures erected upon, above or affixed to the land ***."

ORS 307.020(1)(c) defines "tangible personal property" as follows:

> "'Tangible personal property' includes but is not limited to all chattels and movables, such as boats and vessels, merchandise and stock in trade, furniture and personal effects, goods, livestock, vehicles, farming implements, movable machinery, movable tools and movable equipment."

## IV.   ISSUES

(1)   Is the Compression System "affixed to" or "erected upon" the land under ORS 307.010(1)(b)(B), or is it "movable" machinery or equipment under ORS 307.020(1)(c)?

(2)   If "movable" machinery or equipment, is the Compression System generally moved or movable in the ordinary course of business, or designed to be moved in the ordinary course of business, as required under ORS 307.394?

(3)   Is the Compression System a "farming implement" within the meaning of ORS 307.020(1)(c)?

## V.   STANDARDS OF REVIEW

This division of the court reviews a magistrate decision *de novo* based on the record developed in this division. ORS 305.425(1); *see also* ORS 305.501(6). The court grants a motion for summary judgment only if "the pleadings * * * declarations, and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to prevail as a matter of law." TCR 47 C. *See Christensen v. Dept. of Rev.*, 23 OTR 155 (2018) (citing *Two Two v. Fujitech America, Inc.*, 355 Or 319, 331, 325 P3d 707 (2014)). "No genuine issue as to a material fact exists if, based upon the record before the court viewed in a manner most favorable to the adverse party, no objectively reasonable [factfinder] could [find] for the adverse party on the matter that is the subject of the motion for summary judgment." TCR 47 C. "A material fact is 'one that, under applicable law, might affect the outcome of a case.'" *Ghiglieri v. Tomalak*, 304 Or App 717, 718, 469 P3d 262 (2020) (quoting *Zygar v. Johnson*, 169 Or App 638, 646, 10 P3d 326 (2000), *rev den*, 331 Or 584 (2001)). The adverse party has the burden of producing evidence on any issue raised in the motions as to which the adverse party would have the burden of persuasion at trial. *Id*. The party seeking affirmative relief—in this case, taxpayer as claimant of an exemption from tax— bears the burden of proof at trial. ORS 305.427. The court will construe the statutes supporting exemption strictly but reasonably. *See Habitat for Humanity v. Dept. of Rev.*, 350 Or 257, 261 n 1, 381 P3d 809 (2016) (citing *Eman. Luth. Char. Bd. v. Dept. of Rev.*, 263 Or 287, 291, 502 P2d 251 (1972)).

## VI.   ANALYSIS

The court begins by analyzing the meanings of "erected upon, above or affixed to the land," and "movable," as used in the statutory definitions of "real property" and "tangible personal property," respectively. The court starts with the real property terms because the legislature adopted them first, in 1907, and those terms thus form context for the definition of "tangible personal property," which the legislature adopted in 1935 and amended in 1959. After reviewing the text, context, and (where available and helpful) legislative

history of those terms, the court considers relevant cases interpreting them. As part of its review of cases, the court considers the second issue, namely, the requirement under *Saunders* that exempt farm machinery and equipment be designed to be "moved in the ordinary course of business." 300 Or at 390. The court summarizes its principal conclusions in a separate section after the case analysis. Finally, the court analyzes whether the Compression System is a "farming implement" within the meaning of ORS 307.020(3) and addresses remaining arguments.

A.   *Is the Compression System "affixed to" or "erected upon" the land under ORS 307.010(1)(b)(B), or is it "movable" machinery or equipment under ORS 307.020(1)(c)?*

The department argues that the Compression System is "affixed to" or "erected upon" the land; taxpayer argues that it is "movable" machinery or equipment. The department asserts that the fact that the Compression System is bolted to the concrete floor of the barn suffices to treat it as "affixed to" land and thus real property. The department stated in its motion that "[taxpayer] affixed the Compression System to real property when it bolted the Compression System to the cement floor of the barn"; The department's attorney stated at oral argument that "the Compression System that's at issue here—as stipulated to by the parties—is bolted to the concrete floor of the building in which it's housed. *** [T]hat alone is sufficient for the court to find in the [d]epartment's favor on this motion." Taxpayer disagrees with this position, claiming that additional facts are relevant. The legislature has not defined any of the three terms at issue. Therefore, the court applies the analytical steps set forth in *State v. Gaines* to discern their meaning, starting with the text and context of each statute, proceeding to the legislative history to the extent useful, and consulting general maxims of statutory construction to the extent the legislature's intent remains unclear. 346 Or 160, 171-72, 206 P3d 1042 (2009). The text analysis begins with the plain meaning because courts "assume that the legislature intended words of common usage to be given their ordinary meanings." *OR-OSHA v. CBI Services*, 356 Or 577, 589, 341 P3d 701 (2014). The court will next determine whether the term has a specialized or technical meaning that

differs from the plain meaning and determine whether the legislature intended to use the term in that different, technical sense. *EAN Holdings, LLC v. Dept. of Rev.*, 24 OTR 200 (2020) (citing *DCBS v. Muliro*, 359 Or 736, 745-46, 380 P3d 270 (2016)). For purposes of determining both the plain and technical meanings, the court will consult contemporaneous dictionaries. *Comcast Corp. v. Dept. of Rev.*, 356 Or 282, 296 n 7, 337 P3d 768 (2014) (stressing importance of consulting dictionary definitions contemporaneous with enactment of the statute).

1.   *Plain and technical meanings of "affixed to the land"*

The legislature first added "affixed to" and "erected upon" to the definition of "real property" for property tax purposes in 1907. *See* Or Laws 1907, ch 268, § 2 (HB 89). That law provided, in pertinent part:

> "The terms land, real estate, and real property, as used in this act, shall be construed to include the land itself, whether laid out in town lots, or otherwise, above and under water, all buildings, structures, substructures, superstructures, and improvements *erected upon*, under, or above, or *affixed* to the same, and all rights and privileges thereto belonging or in any wise appertaining *** ."

(Emphases added.)

The contemporaneous *Webster's* definition of "affix" is:

> "1. To subjoin, annex, or add at the close or end; to append to; to fix to any part of; as, to *affix* a syllable to a word; to *affix* a seal to an instrument; to *affix* one's name to a writing.

> "2. To fix or fasten in any way; to attach physically. ***

> "3. To attach, unite, or connect with; as, names *affixed* to ideas, or ideas affixed to things; to *affix* a stigma to a person; to *affix* ridicule or blame to any one [*sic*].

> "4. To fix or fasten figuratively; –with *on* or *upon*; as, eyes *affixed* upon the ground.

> "Syn. – To attach; subjoin; connect; annex; unite."

*Webster's Int'l Dictionary of the English Language* 29 (unabridged ed 1907) (italics in original; boldface and example omitted).

"Affixed" had an established legal meaning as well. Contemporaneous entries in *Black's Law* dictionaries are from 1891 and 1910. Although there was no definition in the 1891 edition for "affix," "*affixus*" was defined as "affixed, fixed, or fastened to." *Black's Law Dictionary* 50 (1st ed 1891). The 1910 edition of *Black's* defined "affix" as:

> "To fix or fasten upon, to attach to, inscribe, or impress upon, as a signature, a seal, a trade-mark. Pen. Code N. Y. § 367. To attach, add to, or fasten upon, *permanently, as in the case of fixtures annexed to real estate*.

> "A thing is deemed to be affixed to land when it is attached to it by the roots, as in the case of trees, vines, or shrubs; or imbedded in it, as in the case of walls; or permanently resting upon it, as in the case of buildings; *or permanently attached to what is thus permanent, as by means of cement, plaster, nails, bolts, or screws*. Civ. Code Cal. § 660; Civ. Code Mont. 1895, § 1076; McNally v. Connolly, 70 Cal. 3, 11 Pac. 320; Miller v. Waddingham (Cal.) 25 Pac. 688, 11 L. R. A. 510."

*Black's* at 48 (2d ed 1910) (emphases added). The legal definition connotes an attachment that is "permanent[]." That definition also provides that an item may become "affixed to land" not only by directly adhering to the land in a certain way, but also, alternatively, by being affixed to a second item that has been affixed directly to the land. The second paragraph from the 1910 edition of *Black's* quoted above lists three ways an item can be affixed to land through direct contact with the land: by roots, by becoming embedded in the land, or by permanently resting upon the land. The italicized language then adds that an item is "deemed to be affixed to land" when the item is permanently attached to "what is thus permanent," *i.e.*, attached to any of the first three affixed items by means such as cement, plaster, nails, bolts, or screws.

The court considers whether the legislature intended to use "affixed" in a technical legal sense, or in the more general sense found in *Webster's*. By 1907, Oregon courts had adjudicated numerous disputes regarding whether particular items that originated as personal property had become real property, and a recurring question was whether the object had become "affixed" or "annexed" to real property.

*See, e.g.*, *Alberson v. Mining Co.*, 39 Or 552, 558, 65 P 978 (1901) ("It is next insisted that the property in controversy, being affixed to the mine, became a part of the realty, and therefore insusceptible of incumbrance by a chattel mortgage."); *Helm et al. v. Gilroy et al.*, 20 Or 517, 521, 26 P 851 (1891) (mortgage case; intention to make item a "permanent accession to the freehold" inferred from "the nature of the article affixed" and other evidence); *see generally O. R. & N. Co. v. Mosier*, 14 Or 519, 13 P 300 (1887) (eminent domain case; previously installed railway tracks, ties, and other structures "affixed" by railroad company did not become "fixtures" because railroad company was "clothed with the power of the state" and installed the items for a public purpose). Whether an item had been affixed or annexed to real property was the first element of the three-part common-law test to determine whether the item had lost its character as personal property and become real property:

> "(1) Real or constructive annexation of the article in question to the realty; (2) appropriation or adaptation to the use or purpose of that part of the realty with which it is connected; (3) the intention of the party making the annexation, to make the article a permanent accession to the freehold, this intention being inferred from the nature of the article affixed, the relation and situation of the party making the annexation, the policy of the law in relation thereto, the structure and mode of the annexation, and the purpose or use for which the annexation has been made."

*Roseburg Nat. Bank v. Camp*, 89 Or 67, 74, 173 P 313 (1918) (citing the "celebrated case" of *Teaff v. Hewitt*, 1 Oh St 511 (1853), adopted by *Henkle v. Dillon*, 15 Or 610, 614, 17 P 148 (1888)).[7]

---

[7] Although the three components of the test for real property were well settled, the meaning of "fixture" was ambiguous. The 1910 edition of *Black's* defined "fixture" first as a "personal chattel substantially affixed to the land, but which may afterwards be lawfully removed therefrom by the party affixing it, or his representative, without the consent of the owner of the freehold." *Black's* at 503 (2d ed 1910). Under the second definition, however, a fixture was "[c]hattels which, by being physically annexed or affixed to real estate, become a part of and accessory to the freehold, and the property of the owner of the land." *Id.* The closing paragraph of the lengthy definition describes the first meaning as referring to a "removable" fixture that remains personal property, and the second as referring to an "irremovable" fixture that has become real property. *Id.* "Fixture," standing alone, could have either of these opposite meanings.

The court considers the legislature to have been aware of this substantial body of case law. *See Blanchana, LLC v. Bureau of Labor & Industries*, 354 Or 676, 691, 318 P3d 735 (2014) ("We presume that the legislature was aware of existing [common] law[.]"). If the legislature had intended to avoid using a legal term of art, it could have listed specific methods of attachment, such as "nailed, bolted, screwed, glued, or similarly attached." Alternatively, the legislature could have qualified the term, for example by adding "whether permanently or temporarily," or "notwithstanding the law of fixtures." The court ascribes to the legislature an intention to use "affixed" in its technical legal sense.

The court concludes that the legislature intended to use the technical meaning of "affixed," *i.e.*, permanently fixed, attached, or fastened—such as by cement, plaster, nails, bolts, or screws—to the land, or to a second item that is embedded in the land or permanently rests upon the land.

2. *Plain and technical meanings of "erected upon" the land*

The court now turns to the meaning of "erected upon." As relevant here, the contemporaneous definition of "erect" in *Webster's* is:

"1. To raise and place in an upright or perpendicular position; to set upright; to raise; as, to *erect* a pole, a flagstaff, a monument, etc.

"2. To raise, as a building; to build; to construct; as, to *erect* a house or a fort; to set up; to put together the component parts of, as of a machine."

*Webster's* at 506 (unabridged ed 1907) (italics in original). The plain meaning suggests that the 1907 legislature intended to classify as real property "all buildings, structures, substructures, superstructures, and improvements" that were raised or constructed on (or under, or above) the land. "Erect" and derivations had a technical legal meaning as well. The 1891 edition of *Black's* defined "erection" as "Raising up; building; a completed building. In a statute on the 'erection' of wooden buildings, this term does not include repairing, alteration,

enlarging, or removal."[8] *Black's Law Dictionary* 429 (1st ed 1891). The 1910 *Black's* definition of "erect" and "erection" were the same as the 1891 definitions. *Compare id.*, *with Black's* at 434 (2d ed 1910). The court finds no difference compared to the plain meaning. An item was erected upon land if it was constructed or put together on land.

3.  *Context and legislative history of "erected upon, above or affixed to the land"*

The context of the 1907 definition of real property for property tax purposes includes prior laws it amended or replaced, in addition to contemporaneous case law. *See Blanchana, LLC*, 354 Or at 691 (case law); *State v. Ziska / Garza*, 355 Or 799, 806, 334 P3d 964 (2014) ("Analysis of the context of a statute may include prior versions of the statute, including any wording changes in a statute over time[.]" (Internal citations omitted.)). Before 1907, "real property" was defined for property tax purposes as:

> "not only the land itself, whether laid out into town lots or otherwise, with all things contained therein, but also all buildings, structures, improvements, trees *and other fixtures* of whatever kind thereon, and all rights and privileges belonging or in any wise appertaining thereto."

General Laws of Oregon, § 1, p 295 (1903) (amending section 3057 of Bellinger and Cotton's Annotated Codes and Statutes of Oregon) (emphasis added); *see also* General Laws of Oregon, Taxes, ch LIII, title I, § 2, p 893 (Deady 1845-1864); General Laws of Oregon, Taxes, ch LVII, title I, § 2, p 748 (Deady 1843-1872). The 1907 amendment thus replaced the list consisting of "buildings, structures, improvements, trees" and "other fixtures" with a list consisting of "buildings, structures, substructures, superstructures, and improvements" that are "affixed to" the land.

The court has considered whether, by referring to items "affixed" to land instead of referring to "fixtures," the legislature may have intended to adopt only the common-law requirement of physical annexation, ignoring the elements

---

[8]  The 1891 edition of *Black's* included a definition of "erect," but the court finds it inapplicable. *Id.* at 429 ("[O]ne of the formal words of incorporation in royal charters. 'We do, incorporate, erect, ordain, name, constitute, and establish.'").

of "adaptation" to the land and the "intention" of the person affixing the item, thereby avoiding the definitional ambiguities associated with the term "fixtures." *See Seven-Up Bottling Co. of Salem v. Dept. of Rev.*, 10 OTR 400, 404 (1987) (rejecting application of three-part common-law test of fixtures on grounds of administrability). The court has found no evidence of such an intention, however. The court has examined Oregon Supreme Court decisions predating the 1907 definition. In all such cases involving property,[9] the Oregon Supreme Court used the term "affix" only as part of an analysis of whether an item had become real property by virtue of its permanent attachment to land, applying the common-law test. *See, e.g.*, *Honeyman v. Thomas*, 25 Or 539, 541, 36 P 636 (1894) ("[I]t cannot be determined from the method of attachment that it was the intention of the parties to permanently affix the derrick to the freehold."); *Helm*, 20 Or at 522 (describing third element of test as "the intention of the party making the annexation to make the article a permanent accession to the freehold, this intention being inferred from the nature of the article affixed"); *Henkle* 15 Or at 614 (Plaintiffs' sole legal basis to subject portable sawmill and engine to its mortgage "is, that they were affixed to the soil, and became part of the realty, and are subject to the same rules of law as the soil itself.").[10] Finally, as discussed below, the court finds it significant that the legislature

---

[9] Other than a signature or a corporate seal "affixed" to a document, or a penalty "affixed" to an act.

[10] The only legislative history that the court has found suggests that the legislature in 1907 was primarily concerned with housing the definition of "real property" in a freestanding statute; the court sees no indication that the legislature intended to deviate materially from the prior definition, which used the term "fixtures" and was embedded in a statute—section 3057 of the Bellinger & Cotton compilation—that described the duties of assessors. *See* Report of the Board of Commissioners Appointed Under the Provisions of Chapter 90, Laws of 1905, for the Purpose of Examining and Reporting on Matters of Assessment and Taxation, etc. at 89 (June 30, 1905), *available at* https://archive.org/details/reportboardcomm00mulkgoog/page/n 5 (accessed Jan 20, 2021) ("1906 Oregon Report"). The legislature commissioned the 1906 Oregon Report to analyze and propose reforms to Oregon's tax system. The report focuses on other topics, including central assessment and pervasive undervaluation, but its bill proposals include a freestanding definition of "real property," which the legislature adopted verbatim as section 2 of the 1907 act. *See* 1906 Oregon Report at 89. The report's commentary states that the bill language is taken in part from the prior law, which was comparable to Minnesota's definition. The only "new" language that the commentary identifies relates to the inclusion of "franchises" as taxable property. *See id.*

reinstated the word "fixtures" (as well as "machinery" and "equipment") into the definition of "real property" in 1935 in the same bill that also defined "tangible personal property." *See* Or Laws 1935, ch 274, § 2.[11]

As a last point of context relevant to the presentation of this case on summary judgment, the court notes the detailed attention early Oregon Supreme Court decisions gave to the manner in which machinery and equipment in particular was attached to the land. For example, in *Henkle* the items at issue were a "12 horse-power traction self-steering engine" that "stood on wheels" and a portable "double saw-mill * * * together with all saws, tools, belts, or appurtenances in anywise connected therewith[.]" 15 Or at 611. The plaintiffs claimed that the engine and sawmill had been "affixed to the soil" and thereby become part of the real property that secured a mortgage they held as mortgagees.

---

[11] Or Laws 1935, ch 274, § 2, amended Oregon Code, title LXIX, ch I, § 69-102 (1930):

"Sec. 69-102. The terms 'land,' 'real estate' and 'real property[,]' [as used in this act] shall be construed to include the land itself, [whether laid out in town lots, or otherwise,] above or under water, *and* all buildings, structures, [substructures, superstructures and] improvements**,** *machinery, equipment or fixtures* erected upon, under, [or] above[,] or affixed to the same, and *likewise all mines, minerals, quarries and trees in, under or upon the land; also all water rights and water powers and* all *other* rights and privileges [thereto belonging or] in any wise appertaining *to the land*; also any estate, right, title or interest whatever in land or real property, less than the fee simple[; and]**.**

"[New ¶] In all cases where the grantor of land or real property has, in the deed or instrument [conveying the same] of conveyance, reserved or conveyed any or all of the timber standing upon such land, with the right to enter upon the ground and remove said timber, the ownership of the standing timber so reserved or conveyed shall be deemed, and hereby is declared to be, an estate and interest in land or real property; also, in all cases where the grantor of land or real property has, in the deed or instrument of conveyance, reserved or conveyed the right to enter upon and use any or all of the surface ground necessary for the purpose of exploring, prospecting for, developing or otherwise extracting any gold, silver, iron, copper, lead, coal, petroleum, gases, oils or any other metals**,** minerals or mineral deposits [of any nature whatever] in or upon said land, such [mineral reservation] right shall be deemed[,] and [is] hereby **is** declared to be[,] an estate and interest in land[; and also all franchises and privileges granted by or pursuant to any law of this state, or municipal ordinance or resolution, owned or used by any person or corporation, other than the right to be a corporation; also all water rights and water powers; and all mines, minerals, quarries, fossils and trees in, under or upon the land.] or real property**.**"

(Italics signify added language; brackets and strike-through signify removed language.)

*Id.* at 614. The defendants claimed that the engine and saw-mill remained personal property. The court described how the machinery was placed on the premises:

> "The engine was held in place by three blocks that were sitting on the sills. The floor was laid right around them so that they couldn't move on the floor. Two of these blocks had grooves cut in the top so that they could fit the hind axle of the engine, and the front block was cut in a circle to fit the front end of the boiler, and the engine was sitting on those blocks. *** The engine was connected to *** [the] portable, double circular saw-mill, by means of a 10-inch rubber belt, running from the fly-wheel of the engine to a pulley on the mandrel of the mill. The engine was in no way attached to the premises on which it stood. The saw-mill machinery was all connected to a square frame[.] *** This frame was set on the floor of the building, and four bolts came up from the floor at each corner of the frame, and went through a block which was laid across the corner of the frame, and screwed down in such a manner as to clamp the frame so it would not move around."

*Id.* at 612-13. The court also described in detail the frequent relocation of the property, which was dependent on the nature and availability of work. *See id.* at 613-14. After reciting the three-part test to determine whether a "chattel" has received the "character of a fixture" and been rendered "immovable," the court concluded that, "considering the portable character of these chattels, the purposes and manner of their use, the way they were annexed ***, this machinery in question never lost its character as chattels[.]" *Id.* at 614-16; *see also Honeyman* (discussed below).

The court concludes that the 1907 legislature did not intend to use the term "affixed" to refer solely to the manner of physical attachment, or to create a bright-line test separate from the law of fixtures. Rather, to determine whether an article has been "affixed" to the land, it is also necessary to examine objective evidence of whether the party making the annexation intended to make the article a permanent accession to the land. The court bases this conclusion on the finding that the legislature intended the term to have its legal meaning, the fact that the legal definition referred to "permanen[t]" attachment to land, the Supreme

Court's prior use of the term as part of the common-law test, and the absence in the legislative history of any indication to break from prior law.

Turning to the phrase "erected upon," the court has found no contemporaneous cases or other sources of context that shed more light on the plain meaning.

### 4.   *Plain or technical meaning of "movable"*

The legislature first used the term "movable" in property tax law in 1935, when it enacted the original definition of "tangible personal property" for property tax purposes:

> "The term 'tangible personal property' means and includes all chattels and movables, such as boats and vessels, merchandise and stock in trade, furniture and personal effects, goods, livestock, vehicles, farming implements, movable machinery, tools and equipment; also all improvements made by persons on lands claimed by them under the laws of the United States, the fee of which lands is still vested in the United States."

Or Laws 1935, ch 274, § 3.[12]

At the time, *Webster's* provided two entries for "movable," one as an adjective and one as a noun. In pertinent part, the definition of the adjective form was:

> "2. Capable of being moved, lifted, carried, drawn, turned, or conveyed, or in any way made to change place or posture;

---

[12] Before 1935, Oregon Code, title LXIX, ch I, § 69-103 (1930), listed "chattels," "goods," and other tangible items within the definition of "personal property," along with certain kinds of intangibles; there was no separate definition of "tangible personal property":

"The terms 'personal estate' and 'personal property' shall be construed to include all things in action, household furniture, goods, chattels, moneys, and gold dust, on hand or on deposit; all boats and vessels, whether at home or abroad, and all capital invested therein; all debts due or to become due from solvent debtors, whether on account, contract, note, mortgage, or otherwise, either within or without this state; all public stocks; all bonds, warrants, and moneys due or to become due from this state, or any county or other municipal subdivision thereof; and stocks and shares in incorporated companies, and such proportion of the capital of incorporated companies liable to taxation on their capital as shall not be invested in real estate; and all improvements made by persons on lands claimed by them under the laws of the United States, the fee of which lands is still vested in the United States."

susceptible of motion; not fixed or stationary; as, a *movable* steam engine.

"* * * * *

"Syn. – Movable, Mobile. That is movable which may be moved, esp. from one place to another; that is mobile which is characterized by great facility, flexibility, or responsiveness of movement[.]"

*Webster's Second* at 1604 (unabridged ed 1934) (boldface omitted). In pertinent part, the definition of the noun form was:

"2. An article of wares or goods; esp., and now only, an article of furniture; * * *

"* * * * *

"4. *Law.* A *Rom. & Civil Law.* A subject of property which is of such a nature as to admit of being moved from place to place without injury; a subject of property not attached to the soil * * *. Strictly, movables are limited to tangible objects, but the term is sometimes used to include choses in action. In a general way movables correspond to the personal property of English law; but the two terms are not synonymous, some forms of personal property, such as growing crops, rent, etc., not being movables."

*Id.* (boldface omitted). As relevant here, *The Oxford English Dictionary* defined "movable" as "apt or disposed to movement; quick or ready in movement; having a tendency to move" and, as relating to property specifically, "admitting of being removed or displaced; applied to 'personal' as opposed to 'real' property." *The Oxford English Dictionary* 725 (1933).

"Movable" and "movables" also had established legal meanings. *Black's* defined "movable" as "that which can be changed in place, as movable property." *Black's* at 1209 (3d ed 1933). *Black's* defined "movables" as:

"[T]hings movable; movable or personal chattels, which may be annexed to or attendant on the person of the owner, and carried about with him from one part of the world to another. 2 Bl. Comm. 387. *Movables* consist—*First*, of inanimate things, as goods, plate, money, jewels, implements of war, garments, and the like or vegetable productions, as

the fruit or other parts of a plant when severed from the body of it, or the whole plant itself when severed from the ground[.]

"Movables are further distinguished into such as are in possession, or which are in the power of the owner, as a horse in actual use, a piece of furniture in a man's own house; and such as are in the possession of another, and can only be recovered by action, which are therefore said to be in action, as a debt."

*Id*. (italics in original). The court does not see a substantive difference between the plain meaning and the technical legal meaning. The court concludes that the noun "movables" referred to tangible objects that are not attached to real property, and that the adjective "movable" referred to an object's tendency to move or ability to be moved because the object is not fixed in place or attached to real property.

In 1959, the legislature added two new instances of the word "movable" to the statute.[13] The 1959 amendment read as follows:

"(3)  'Tangible personal property' means and includes all chattels and movables, such as boats and vessels, merchandise and stock in trade, furniture and personal effects, goods, livestock, vehicles, farming implements, movable machinery, *movable* tools and *movable* equipment [and all machinery and equipment used in the manufacture of raw or partially manufactured products]."

---

[13] After 1935 and before 1959, the legislature made two other changes. A 1939 law extended the definition of "tangible personal property" to include all machinery and equipment used in manufacturing, an extension that the legislature retracted in 1959 as discussed in this order:

"The term 'tangible personal property' means and includes all chattels and movables, such as boats and vessels, merchandise and stock in trade, furniture and personal effects, goods, livestock, vehicles, farming implements, movable machinery, tools and equipment and all machinery *and equipment used in the manufacture of raw or partially manufactured products*; also all improvements made by persons on land claimed by them under the laws of the United States, the fee of which lands still is vested in the United States."

Or Laws 1939, ch 450, § 1 (SB 456) (italics signify added language). In addition, before the codification of the ORS in 1953, the legislature removed the phrase following the semicolon referring to improvements on federal land. *See former* ORS 307.020(3) (1953), *renumbered as* ORS 307.020(1)(c) (2005).

Or Laws 1959, ch 82, § 1 (strikethrough indicates deleted text; italics indicates inserted text).[14] The plain meaning of "movable" did not materially change between 1935 and 1959.[15] The court has found no change to the technical legal meanings of "movable" and "movables." *Compare Black's* at 1209 (3d ed 1933), *with Black's* at 1165 (4th ed 1957).

Based on the plain and technical meanings of the term, the court tentatively concludes that the legislature intended to classify as tangible personal property machinery and equipment that is capable of being moved because it is not fixed in place or attached to real property.

5.    *Context and legislative history of "movable"*

Statutory context includes not only other contemporaneous statutes and court opinions in existence, but also other provisions of the same bill containing the term in question. *See* Hon. Jack L. Landau, *Oregon Statutory Construction*, 97 Or L Rev 583, 640 (2019) ("The idea that the legislature was likely aware of other parts of the 'same statute' refers to other parts of the same bill[.]") (citing *State v. Ortiz*, 202 Or App 695, 698-700, 124 P3d 611 (2005)). As noted, in the same 1935 law the legislature both used the term "movable" in the definition of "tangible personal property" and added the term "fixtures" back to the definition of "real property." Early cases applying the common law of fixtures used the term "movable" (or its opposite "immovable") to characterize an item that has retained its character as personal property despite some degree of annexation to real property. For example, in a suit to enforce a mechanic's lien, the court held that a derrick or crane erected by the lessee of a stone quarry

---

[14] The statute was not changed again until 2005, when it was renumbered and the phrase "means and includes" was replaced by "includes but is not limited to." Or Laws 2005, ch 94, § 30. The legislature intended that change to be nonsubstantive. *See* Or Laws 2005, ch 94 ("Relating to correction of erroneous material in Oregon tax law").

[15] The adjective form of "movable" in *Webster's* was:

"2 a : capable of being moved : not fixed : not stationary *** : not restricted to one position or location ***[.]

"b *of property* (1) : that can be removed or displaced and that is thus usu[ally] personal rather than real ***[.]

*Webster's Third New Int'l Dictionary* 1471 (unabridged ed 1961). The noun form of "movable" in *Webster's* was "a piece of property (as an article of furniture) that can be removed or displaced : a movable piece of property[.]" *Id.*

did not become real property although it was held in place by guy ropes attached to stakes and anchor bolts embedded in rock. *Honeyman*, 25 Or at 541. Regarding the mode of attachment, the court found that the guy ropes merely steadied the derrick. *Id*. The court found no evidence in the lease indicating an intention that the derrick would become real property, and the court found that the lessee would likely need to move the derrick as portions of the quarry became played out. *Id.* In its legal analysis, the court described the derrick alternately as "movable," a "movable appliance," a "movable fixture[]," and a "trade fixture *** within the removable class." *Id.* at 541-43 (quoting in part *Leonard v. Stickney*, 131 Mass 541, 541 (1881) ("The object, the effect and the mode of annexation are all to be considered in determining whether any specific articles are movable fixtures.")); *see also Henkle*, 15 Or at 614 ("to give a chattel the character of a fixture, and to render it immovable, three things are necessary"); 16 Or Op Atty Gen 674 (1934) (quoting *Henkle* and *Leonard*).

Later cases more often used the term "removable" (or "irremovable") rather than "movable." *See, e.g.*, *Roseburg Nat. Bank*, 89 Or at 74 ("The line between removable and irremovable fixtures is sometimes so close and difficult to ascertain that it is impossible to frame a precise, unbending, and infallible rule which can be applied to all cases."); *see also* Donald Ross Marshall, *The Law of Fixtures in Oregon*, 19 Or L Rev 152 (Feb 1940) (surveying cases). However, as of 1935, Oregon's bulk sales law referred to "movable store and office fixtures" as among the items whose sale could trigger the requirement of a notice to creditors, if part of a purchase of goods in bulk or of "substantially all of the fixtures or equipment" used in the business. *See* Oregon Code, title LXIV, ch 1, § 64-101 (1930) (requiring notice before purchase, *inter alia*, of "all or substantially all of the fixtures or equipment *** including movable store and office fixtures").[16]

---

[16] "Movable" also appeared in the definition of "motor vehicles" in the motor vehicle code: "'Motor vehicles' shall include all vehicles, engines or machines, *movable* or immovable, which are operated or propelled by combustion of gasoline, distillate or other volatile and inflammable liquid fuels." Oregon Code, title LV, ch XV, § 55-1501 (1930) (emphasis added). Finally, Oregon Code, title XVIII, ch XIV, § 18-1408 (1930), required beekeepers to house honeybees in hives with "movable" frames, as opposed to hives that were "mere boxes without movable frames." This requirement apparently facilitated inspection for disease and for purposes of property tax assessment. *See* Oregon Code, title XVIII, ch XIV,

From this context, the court concludes that the 1935 legislature likely intended the term "movable" to have the same meaning as in reported court decisions: The term required an analysis of the facts indicating the manner and degree of attachment to real property, as well as the remaining factors of the common-law test to the extent applicable in the circumstances.

The statutory context of the 1959 amendments, as explained in portions of the legislative history, adds a small amount of background.[17] As noted above, the legislature in 1939 broadened the definition of "tangible personal property" to include "all machinery and equipment used in the manufacture of raw or partially manufactured products." Or Laws 1939, ch 450, § 1 (SB 456). The 1959 amendments undid this expansion. Minutes from committee hearings indicate that the purpose of the 1959 legislation was to "amend the definitions of real property and personal property to provide that all fixed machines and equipment shall be deemed real property."[18] Minutes, Senate Committee on Taxation, Jan 22, 1959 (SB 58). One apparent reason for the change was to simplify the jobs of assessors by reclassifying as real property items that since 1939 had been required to be treated as tangible personal property—despite the fact that they were affixed to real property—thereby restoring the prior, "customary" legal classification:

> "During the period when the personal property tax off-set was available under the corporation excise tax laws,[19] certain machinery used in manufacturing processing was classified as personal property *even though affixed to the building or ground*. Such property would now be classified only as realty, but, as a matter of policy, the legislature

§§ 18-1401 - 18-1411 (1930) (regulating hive infection control and property taxation of hives).

[17] The parties did not provide legislative history for the 1935 act, and the court has found none.

[18] Taxpayer, which supplied the legislative history of the 1959 amendments at the court's request, represented that audio recordings of the 1959 legislative committee proceedings are not available.

[19] The "offset" functioned as a credit against income tax. *See Saunders*, 300 Or at 390 ("The corporate taxpayer in *Warm Sprgs. Lbr. Co.* [*v. Tax Comm'n*, 217 Or 219, 342 P2d 143 (1959),] sought to have the buildings classified as tangible personal property so that it could receive an offset against its corporate excise tax for personal property tax paid.").

allowed it to be classified as personalty in order to give the personal property tax offset to the owners. With the elimination of the personal property tax offset except as to inventories *there seems no reason why the law should not be returned to its former status and the customary legal classifications restored*, inasmuch as this will aid assessors and appraisers in their work."

*Id*. (emphases added); *see also* Minutes, House Committee on Taxation, Feb 20, 1959 (SB 58) ("[T]his bill, which redefines fixed machinery and equipment used in manufacture as real property * * * would facilitate the work of the assessors, who now have to make three segregations in their appraisals of such property."); Minutes, House Committee on Taxation, Feb 25, 1959 (SB 58) (explaining that SB 58 "redefines fixed machinery and equipment used in manufacture as real property"). To effect this change, the legislature deleted the 1939 text that had expanded the definition to include "all machinery and equipment used in the manufacture of raw or partially manufactured products," and the legislature added the requirement that any tools or equipment be "movable."

The court interprets the 1959 reference to the "customary legal classifications" as simply reiterating that, consistent with the common law of fixtures, an article is real property if it is "affixed" to real property, and it is personal property if it is "movable."

6. *Cases distinguishing between real property and personal property for property tax purposes*[20]

The court first reviews the relevant cases, then draws overall conclusions in a summary below.

---

[20] The parties extensively discuss definitions of the statutory terms set forth in the department's administrative rules. Neither party suggests that the department promulgated these rules pursuant to a specific delegation of legislative authority. *Cf.* ORS 305.100(1) ("The Department of Revenue shall make such rules and regulations it deems proper to regulate its own procedure and to effectually carry out the purposes for which it is constituted."). As with many administrative rules, the rules proffered in this case are interpretive and, while doubtless useful as summary guidance on the relevant case law and administrative practice, cannot supersede the statutes. *See Avis Rent A Car System, Inc. v. Dept. of Rev.*, 330 Or 35, 51, 995 P2d 1163 (2000) (holding that the department's rules were interpretive and invalid to the extent conflicting with statute). The court focuses on construing the statutes and applying any relevant judicial decisions.

The first Oregon opinion that discusses the definitions of real and tangible personal property for property tax purposes does not aid the analysis in this case because the court's legal conclusions made it unnecessary to apply the classifications. In *First National Bank v. Marion County*, 169 Or 595, 130 P2d 9 (1942), which involved tax years 1929 to 1939, the taxpayer was a national bank that occupied a building as lessee. *See id.* at 597-99. As a national bank, its personal property was immune from property tax. *Id.* at 597. The assessor classified a vault door, chandeliers, and various other items as "trade fixtures" and "equipment," but assessed them to the bank as *real* property, asserting various legal theories. *See id.* at 600-03. The court rejected the assessor's position as a matter of law, because there was no evidence that the bank held any interest in real property other than as a lessee, and no statute at the time provided that the mere ownership of trade fixtures creates a separate taxable interest in real property. *Id.* at 616. The court declined to decide whether the trade fixtures and equipment in question were real property or personal property for property tax purposes. *Id.* at 615-16. The court also declined to decide whether the trade fixtures and equipment could be taxed to the owner/lessor of the real property as "fixtures annexed to or improvements of" real property, which the assessor had not attempted to do. *Id.* at 615. Thus, although the opinion examines in significant detail the manner in which the vault door and frame were attached to the building, the custom in the banking industry of removing and replacing vault doors despite their substantial weight, and the manner of attachment of the chandeliers, the opinion does not apply the statutory definitions of real and tangible personal property. *See id.* at 600.

In the second case, the Oregon Supreme Court construed the definition of "tangible personal property" as applicable to certain tax years from 1947 through 1955. *Warm Sprgs. Lbr. Co. v. Tax Comm'n*, 217 Or 219, 221-22, 342 P2d 143 (1959) (*Warm Springs Lumber*). At issue was whether the taxpayer was eligible for the income tax "offset" for property tax paid with respect to "tangible personal property" as discussed above. *Id.* The taxpayer, which engaged in logging and lumber manufacturing on leased land, claimed that

"buildings" consisting of a "'sawmill, dry kilns, lanning mill, factory, warehouse and sorting sheds'" were tangible personal property. *Id*. at 223 (quoting taxpayer's factual allegations). These buildings had no solid footings but for the most part rested on concrete posts. *Id*. The taxpayer also claimed that about 40 temporary dwellings for workers were tangible personal property. *Id*. The taxpayer had entered into an agreement with the landowner, the Confederated Tribes of the Warm Springs Reservation of Oregon, providing in part that any improvements placed on the land by the taxpayer would remain the taxpayer's property and that the taxpayer may remove them within two years after expiration of the lease. *Id*. The court found it "entirely clear" that the buildings and structures were "erected upon land." *Id*. at 224. For that reason, the court concluded that they constituted real property and not tangible personal property as defined in ORS 307.010 and ORS 307.020, respectively. *Id*. Accordingly, the court denied the income tax offset.

The court in *Warm Springs Lumber* considered the taxpayer's argument that the buildings were personal property because the taxpayer's lease allowed the taxpayer to remove them. *Id*. at 225. The court concluded, however, that the agreement was not binding on a taxing authority because a taxing authority is not a party to the agreement. *Id*. ("[T]here are numerous instances in which [the rule respecting the parties' classification by agreement] does not hold good where the rights of third persons are involved.").[21] As authority for the third-party rule, the court cited a California Supreme Court decision, which in turn cited longstanding cases from a variety of jurisdictions. *Id*. (citing *Trabue Pittman Corp. v. Los Angeles County*, 29 Cal 2d 385, 396, 175 P2d 512 (1946) ("[T]he agreement of the

---

[21] Later Oregon cases cited *Warm Springs Lumber* for this rule and used principles from the common law of fixtures to determine the character of the disputed property for property tax purposes. *See Shields v. Dept. of Rev.*, 266 Or 461, 470-71, 513 P2d 784 (1973) (allowing assessment of tenant-installed ceilings, plumbing, heating and air conditioning equipment, and electrical wiring as real property even though characterized as personal property in lease; stating it is "not reasonable that the landlord would desire the tenant to remove" items of that character); *Moore & Paulson v. Dept. of Rev.*, 4 OTR 573, 577-78 (1971) (treating taxpayer's house as real property although the house had been moved to the property, and merely rested upon a concrete slab; citing three-factor common-law test for real property).

parties, whether express or implied, is not binding upon the taxing authorities." (Citing cases.))). The court in *Warm Springs Lumber* also mentioned two other specific rationales that the California court articulated in *Trabue Pittman*: (1) a California statute defined "improvements" as real property and defined "fixtures" as improvements; and (2) the common law of fixtures treated a tenant's trade fixtures as real property until removed. *Id.* at 226. The court in *Warm Springs Lumber* did not specifically mention an additional ground that the *Trabue Pittman* court discussed at some length, namely, the California attorney general's argument that "the interest of uniformity of taxation should require *** that trade fixtures be characterized as real property for taxation purposes, and not as personal property as held by the trial court." *Trabue Pittman*, 29 Cal 2d at 392. The court in *Trabue Pittman* stated:

> "Just as assessors are not bound by private agreements, they should not be frustrated or hindered in performing their vital functions by the necessity of ferreting out the often undisclosed and secret intentions of lessors and lessees relative to the terms of a lease. For the most part, assessors must be allowed to act on the basis of outward appearances. ***
>
> "*****
>
> "***Disregard of any distinction between improvements installed by tenants and improvements installed by an owner of property insofar as taxation is concerned expedites the work of the assessor and tends toward uniformity."

*Id*.

In *Bylund v. Dept. of Rev.*, 9 OTR 76 (1981) this court considered the classification of "housedrops," which are television cable and related hardware running from a utility pole to and into a cable subscriber's home and terminating in a wall outlet. *Id.* at 77. The county assessor had been assessing housedrops to the local cable companies as personal property. *Id.* at 78. One company challenged that treatment, claiming that the housedrops had become real property and should be part of the assessment to homeowners. *Id.* at 78-79. Nothing in the agreement between the cable company and the homeowner addressed ownership, control, or final disposition of the

housedrop. *Id.* at 78. This court held that the housedrops were real property based on the three-part common-law test. *See id.* at 79-83. As to the first two elements, the court readily concluded that the cable and hardware had been annexed to real property and were adapted to the portion of the homes to which they were connected. *Id.* at 80 (citing *Roseburg National Bank*, 89 Or at 74). The court considered the third element, whether the cable company that originally made the annexation intended to make the housedrops a "permanent accession to the freehold." *Id.* (quoting *Roseburg National Bank*, 89 Or at 74). To discern the company's intention, the court relied on objective facts revealing "'the nature of the article affixed, the relation and situation of the party making the annexation, the policy of the law in relation thereto, the structure and mode of the annexation and the purpose or use for which the annexation has been made.'" *Id.* at 80 (quoting *Roseburg National Bank*, 89 Or at 74). The court stated that a conclusion that property is a fixture does not end the analysis. Trade fixtures removable without substantial injury to the building may be taxable as personal property, but the result ultimately depends on an intention to make the fixtures permanent. *Id.* at 82-83. Although the cable agreement was silent about the classification of the housedrops, the court also cited *Warm Springs Lumber* for the proposition that such an agreement would not bind an assessor in any event. *Id.* at 83. Some evidence weighed in favor of treating the cable company as owner of the housedrops (for example, the company repaired or replaced components as needed at its own expense), but the court found it significant that the cable company had a clear motivation to leave housedrops in place when subscribers moved, enabling the company to recruit the new homeowner to become a subscriber for a modest "reconnection" fee. *Id.* at 82. The court found that removal of a housedrop would likely damage the real property, requiring minimal exterior repairs but "quite possibly substantial repairs" to the interior, with the result that the company would likely abandon the interior material. *Id.* Thus, the court concluded that the housedrops were real property because they were "fixtures" that could not be removed without substantial injury to the premises.

In *Seven-Up Bottling Co. of Salem v. Dept. of Rev.*, the taxpayer argued that machinery and equipment used

to bottle soft drinks (fluid tanks, air compressors, heaters, water treatment and a palletizing machine) constituted tangible personal property and was thus eligible to be depreciated, rather than subject to the annual trending of value generally applied to real property. 10 OTR at 401 & n 1. The court viewed the issue as whether the machinery and equipment were "movable" within the meaning of *former* ORS 307.020(3),[22] *renumbered as* ORS 307.020(1)(c) (2005), as opposed to "affixed" or "erected upon" real property. *Id.* at 407. After reviewing the parties' arguments regarding the appropriate legal standard, the court concluded that "machinery, tools and equipment which are nailed, bolted, screwed or glued to real property are not 'movable' within the meaning of the statute." *Id.* The court reached this conclusion by applying the principle of *ejusdem generis* to the list of items in the definition of "tangible personal property," observing that, "[a]s a general rule, the specific types of items listed in the statute are not 'affixed' to anything." *Id.* According to the court, the department's administrative rule appropriately captured the concept of "movable" in the phrase "'readily movable as opposed to apparently stationary or fixed items.'" *Id.* The court expressly rejected the "'three-prong' test of annexation, adaptation and intention" usually applied in the law of fixtures as a means of determining whether an article is real or personal property. *Id.* at 404. Criticizing *Bylund*, and quoting from the passage in *Trabue Pittman* reprinted above, the court stated that "the common law test *** is generally inconsistent with the statute." *Id.* at 405.

The court in this case cautions against a literal reading of *Seven-Up Bottling* to mean that any machine, tool or item of equipment automatically becomes real property merely by being "nailed, bolted, screwed or glued to real property." *Seven-Up Bottling* predated the analytical framework announced in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 611-12, 859 P2d 1143 (1993), *as modified in Gaines. See Tektronix, Inc. v. Dept. of Rev.*, 354 Or 531, 543-46, 316 P3d 276 (2013) (finding error in this court's statutory analysis stemming from failure to apply *Gaines* framework).

---

[22] The court did not indicate to which edition of the ORS it cited.

As a result, the court in *Seven-Up Bottling* did not consider whether the legislature used the terms "movable" and "affixed" in a technical legal sense; it did not consider the context of existing case law in which the legislature used the terms; and it instead turned to the maxim of *ejusdem generis* to interpret them. *See Seven-Up Bottling* at 403-04 (referring to "natural and obvious" meanings of terms; analyzing department's rule); *Gaines*, 346 Or at 172 (resort to maxims appropriate if legislative intent remains unclear after examining text, context, and any helpful legislative history); *DISH Network Corp. v. Dept. of Rev.*, 364 Or 254, 272 n 21, 434 P3d 379 (2019) (characterizing *ejusdem generis* as maxim). The court in this case has been unable to find any such bright-line rule in an examination of the text, context and available legislative history of the statutes or in the words of the Oregon Supreme Court.

Likewise, it would be a mistake to rely on *Seven-Up Bottling* to reject all aspects of the three-part common-law test, or all of the case law that has applied the common law of fixtures. Neither *Warm Springs Lumber* nor *Trabue Pittman* rejected the common-law test. Both of those courts applied the rule that a private agreement as to the character of property does not apply to a third-party taxing authority, but that rule is *itself* a longstanding part of the common law of fixtures. *See Trabue Pittman*, 29 Cal 2d at 397 (citing cases); *see also* Marshall, 19 Or L Rev at 166 ("A subsequent mortgagee, lienor, or purchaser of the realty upon which the article is affixed, who had no notice of the agreement, will not be affected thereby, but as to him, the article will be treated as a fixture. *** [T]o hold otherwise would render uncertain land titles, endanger the rights of purchasers, and afford opportunities for fraud, since the agreement is unrecorded and in the nature of a secret lien." (Footnotes omitted.)); *see also Moore & Paulson v. Dept. of Rev.*, 4 OTR 573, 577 & n 1 (1971) (citing common-law test; relying on *Warm Springs Lumber* in treating building as real property). The same rationale informs the common-law requirement that evidence of an "intention" to affix property permanently must be objective; a property owner's subjective intention to move property does not control. *See* Marshall, 19 Or L Rev at 160 ("secret, personal, psychological, and subjective intention with which [property]

is affixed" is not controlling (footnote omitted)). The court in this case recognizes that the legislature created statutory definitions of "real property" and "tangible personal property," and that the legislature was free to deviate from the common-law definitions of those terms in doing so. *Warm Springs Lumber*, 217 Or at 226 ("It is well settled * * * that for purposes of taxation the definitions of real property in the revenue and taxation laws of the state control whether they conform to definitions used for other purposes or not." (Quoting *Trabue Pittman*, 29 Cal 2d at 393 (internal quotation marks omitted).)). However, the court concludes that, by using the terms "affixed" and "movable" without enacting separate definitions of those terms, and by reinstating the term "fixtures" in 1959, the legislature expressed an intention to apply, rather than deviate from, the meanings that those terms had under common law.

Despite concerns about the statement of the legal test in *Seven-Up Bottling*, the court in this case views the factual analysis in *Seven-Up Bottling* as a valid and useful model to determine the underlying facts relevant to whether property is "movable" or "affixed" to real property. After a trial and a viewing of the property to better understand the evidence, the court found that most of the machinery and equipment at issue was "integrated and interrelated by pipes, wiring and conveyors as [was] necessary to process and produce plaintiff's product." 10 OTR at 401. The court further found:

> "Some of the equipment, such as the large bottle washer, the palletizer and some conveyors are not attached to the building but merely rest in place by virtue of their weight. However, these items are attached to other equipment such as conveyors, pipes or wiring. Some equipment is attached to the building by bolts or screws, but, as plaintiff points out, it could be removed without significant damage to the building. In some areas the building has been modified to accommodate the conveyors, pipes and heating ducts which pass through the walls or the roof."

*Id*. The court held that, with a few exceptions, the machinery and equipment was real property:

> "[M]ost of the subject property is 'affixed' or 'erected upon' real property. Most of the equipment is bolted or screwed to

> the walls, ceilings or floor and attached by pipes, ducts and conduits. This equipment is not moved except when modifying the operational layout. In fact, movement of the equipment would be inconsistent with the operation and function it performs. Movement would usually result in misalignment, leaks and faulty application of the products. The very purpose of the small bolts and screws plaintiff refers to is to prevent movement."

*Id*. at 407-08. Similarly, the court held that a large stainless steel tank was real property because it was not "movable" due to its attachment by "solid plumbing connections" and its weight and bulk. *Id*. at 408. By contrast, the court held that some smaller tanks "not connected with plumbing connections but drained through flexible rubber hoses," were personal property because they were "readily movable" within the room or the plant. *Id*. The factual discussion thus reveals a careful examination of the manner of attachment to real property (not only with bolts and screws, but also via pipes and conduits), modifications of the building that were necessary to accommodate the equipment, the possibility of damage to the building upon removal, and the degree of care required to dismantle and reassemble the equipment without causing leaks. A similar level of thoroughness is likely necessary in any case involving large or complex machinery or equipment.

> 7.  *Cases under statutes exempting farm machinery and equipment*

While the foregoing cases involved solely the statutory definitions of real and tangible personal property, two cases involved both of those statutes as well as the statutory predecessor of the farm machinery and equipment exemption now in ORS 307.394. In *Saunders*, the taxpayer sought exemption for two items under the predecessor of ORS 307.394,[23] arguing that the items were "movable equipment"

---

[23] The exemption statute at issue in *Saunders* and *Columbia River Egg Farm v. Dept. of Rev.*, 12 OTR 418 (1993) (discussed below) was *former* ORS 307.400(3) (1985), *renumbered, in part, as* ORS 307.394 (2001). *See Saunders*, 300 Or at 388. That statute exempted "inventory," defined nonintuitively to include "tangible personal property" that is "[f]arm machinery and equipment" used for specified purposes, including the planting, raising, cultivating, or harvesting of farm crops. *See* Or Laws 1973, ch 670, § 3 (inserting "farm machinery" into definition of "inventory" in *former* ORS 310.608(3), *renumbered as* ORS 307.400 (1981);

as required by *former* ORS 307.020(3) (now ORS 307.020(1)(c)). 300 Or at 389-90. The items at issue were "Harvestores," which the court repeatedly described as "structures," similar in appearance and use to silos. *Id.* at 386, 387, 390. The Harvestores were 20 feet in diameter; one was 33 feet tall and the other was 77 feet tall, and both were bolted to a two-foot-thick concrete pad. *Id.* The taxpayer argued that the Harvestores were "movable" because they could be unbolted, moved, and erected someplace else. *Id.* at 387. The court disagreed, stating that "even though the Harvestores are 'movable' in the sense that the bolts can be removed and the structure moved to another location, they are not 'movable' under ORS 307.020(3), nor are they 'inventory' under ORS 307.400." *Id.* The court thus reached a conclusion not only under the definitional statutes, but also under the exemption statute.[24]

In its conclusion under the statutory definitions of tangible personal property and real property, the court stated that the Harvestores were "structures or improvements 'erected upon *** or affixed to the [land]' within the meaning of ORS 307.010(1)." *Id.* at 390. The court compared the Harvestores to the "buildings and structures" in *Warm Springs Lumber*, which the court also had concluded were real property. *Id.* In reaching its conclusion under the exemption statute, the court reviewed the legislative history of *former* ORS 307.400(3) (1977), finding that the legislature intended that the exemption for farm machinery and equipment apply only to items "designed to be moved in the

---

Or Laws 1977, ch 819, § 1 (adding requirement that "inventory" be "tangible personal property" as explained in *Saunders*, 300 Or at 388-89); ORS 307.400 (1981) (noting recodification of *former* ORS 310.608 (1979)). In 2001, the legislature created ORS 307.394 and moved much of the text related to exemption for farm items from ORS 307.400(3) to that new freestanding exemption statute, which omits any reference to "inventory." *See* Or Laws 2001, ch 753, §§ 12, 15. The court considers the discussion in *Saunders* pertaining to the legislature's intent regarding *former* ORS 307.400 (1985) and *former* ORS 310.608 (1977) to be precedential and binding for purposes of this court's analysis of ORS 307.394. *See Dept. of Rev. v. New Friends of the Beaverton City Library*, 23 OTR 512, 516 (2019) ("[T]his court, as a lower court, is bound to follow [Oregon Supreme Court decisions.]").

[24] The court also rejected the taxpayer's argument that his agreement with the manufacturer that the Harvestores "'shall at all times be and remain personalty'" controlled. *Id.* at 390-91. Citing *Warm Springs Lumber*, the court stated that the agreement "does not override the terms of a statute that must be followed by the Department of Revenue ***." *Id.* at 391.

ordinary course of business." *Id*. at 390 ("Whatever the result might be if only ORS 307.020(3) were involved, the legislative history of ORS 307.400(3) shows that the legislature, in creating the exemption, intended to exempt described personal property that generally is moved or movable in the ordinary course of business.").[25] Although the court was satisfied that Harvestores "can be and occasionally are moved," either after being dismantled or in one piece with the aid of a "silo mover," the taxpayer presented no evidence that Harvestores are moved in the ordinary course of business— the only evidence involved Harvestores moved after foreclosure on a conditional sales contract or upon the sale of a farm without a Harvestore. *Id*. at 390 & n 1.

Eight years after *Saunders*, this court applied the "ordinary course of business" requirement to machinery and equipment at a chicken egg farm. *Columbia River Egg Farm v. Dept. of Rev.*, 12 OTR 418 (1993). This court held that the cages ("confinement systems"), the feeding, watering and waste removal conveyors and piping associated with them, and the equipment in the adjacent and connected processing plant, were not "'moved or movable in the ordinary course of business.'" *Id*. at 421 (quoting *Saunders*, 300 Or at 390). The court found that the confinement systems were "integrated into or with their buildings":

> "The evidence established that the confinement systems in some instances are bolted to the floor and in all instances are connected to the buildings with pipes, conveyors and wires. Each moving part is carefully aligned in relationship to the building. The automatic feeding system augers feed from the permanently affixed feed bins outside the building through tubes into the building where it is fed into the traveling hopper. The manure removal conveyors are carefully arranged so the manure drops into the trench where the conveyor moves it outdoors. Needless to say, the conveyors for the collection and movement of the eggs are

---

[25] The department cites *Saunders* for the proposition that the definition of "tangible personal property" in ORS 307.020(1)(c) includes only property that is "movable in the ordinary course of business." Based on the portion of *Saunders* quoted above, the court finds that characterization overly broad. The court concludes that *Saunders* applied the "ordinary course of business" requirement only to the category of tangible personal property for which an exemption is sought under what is now ORS 307.394.

likewise carefully aligned and coordinated. The efficiency of the equipment relies upon the automated features of its operation. Movement of the equipment is inconsistent with its intended use and would disrupt all aspects of the [automated] process.

"Although the confinement systems may not be of enormous weight, certainly their bulk and shape do not admit to easy movability. The evidence showed they must be disassembled to moved. While this is relatively simple, it is time consuming. * * * Finally, the electrical panels, plumbing controls and connections are incorporated into the buildings."

12 OTR at 421-22. As to the processing equipment, which was connected to the confinement systems by egg conveyors, the court likewise found that the equipment was integrated into the processing plant building. The court held that the conveyor equipment was not "movable" because it would be required to be disconnected from piping, venting and "hard electrical lines," and the disconnection would render it inoperable. *Id*. at 422. The washing system used a water softening system and a boiler that were "clearly affixed to and part of the real property." *Id*. Accordingly, none of the subject property was eligible for exemption as tangible personal property constituting farm machinery and equipment.

　　8.　*Summary of conclusions as to whether the Compressor System is "movable," "erected upon, above or affixed to the land," or "designed to be moved in the ordinary course of business" under ORS 307.020, ORS 307.010, and ORS 307.394*

　　Applying the foregoing statutory analysis and review of cases to the Compressor System, the court concludes as follows. First, the court agrees with the department that the phrase "erected upon" is of little help in this case. Ignoring activities on water or in midair, literally any item to be "constructed" or "put together" will undergo that process on land or on other real property, including obvious movables such as a do-it-yourself bookcase. The original usage in 1907 applied to "buildings, structures, substructures, superstructures, and improvements," but those items typically also would have been "affixed" in the sense of "imbedded in [the land], as in the case of walls; or permanently resting upon

[the land], as in the case of buildings." *Black's* at 48 (2d ed 1910). *Warm Springs Lumber* and *Moore & Paulson* applied "erected upon" to buildings, but those cases did not involve machinery or equipment.

Second, under the legal meaning of "affixed" discussed above, the reference to "the land" in the phrase "erected upon, above or affixed to the land" includes any other real property. For example, a window frame is affixed to the "land" by virtue of its attachment to walls, which are attached to a concrete foundation, which is attached to the land. The foundation is "imbedded" in the land, while the walls and window frame are "permanently attached to what is thus permanent." *Black's* at 48 (2d ed 1910). This leads the court to reject an alternative argument that taxpayer has made in this case, that the Compression System is real property only if it is affixed to or erected upon the land itself. In its supplemental brief, taxpayer argued that "[T]he Compression System has no connection to the land. * * * The Compression System is isolated from the land, it is merely located on a barn floor. * * * The Compression System is not real property because of its lack of connection to the land."[26]

Third, contrary to the department's position, the fact that the Compressor System is attached to real property by bolts does not necessarily mean that it is real property. The department in its motion stated that "Farmers affixed the Compression System to real property when it bolted the Compression System to the cement floor of the barn" and cited OAR 150-307-0010(2)(b)(B). When the legislature used the terms "affixed to" and "movable," it was not writing on a blank slate. Each term had an established

---

[26] The court notes further that the legislative history of the 2003 law substituting "the land" in place of "the same" confirms that the change was non-substantive. *See* Staff Measure Summary, House Committee on Revenue, HB 2424, Mar 3, 2003) ("legal definitions are not redefined in this bill"; bill "updates syntax and adjusts language to make it more consistent across existing statutes"); Tape Recording, Senate Committee on Revenue, HB 2424, Mar 3, 2003, at 34:57-35:45 (statement of Legislative Revenue Officer Paul Warner), *available at* http://records.sos.state.or.us/ORSOSWebDrawer/Record/4179826# ("Each interim, Legislative Counsel goes through the tax statutes and tries to revise them in a way that changes the syntax, gets rid of obsolete statutes, reorders a number of things, and this is their work for the last interim, HB 2424. There are no substantive policy changes in the bill despite its size.").

legal meaning within the context of the law of fixtures, and there is no indication that the legislature intended to deviate from those established meanings. "Affixed" and "movable" functioned as opposites and as labels, respectively, for real property and tangible personal property. In the absence of a separate, bright-line test specifically for property tax purposes, the classification of property as tangible personal property or real property is intensely factual, and the court must make the determination with a full understanding of the physical relationship between the items at issue and any real property, including objective indications of whether the person who affixed the property intended to make it a permanent accession to the land. Especially when the property at issue is machinery or equipment, as opposed to the "structures" at issue in *Saunders* or the "buildings" at issue in *Warm Springs Lumber*, evidence that an item is bolted to a floor may not, in and of itself, necessarily establish that the item is "affixed" to real property or is not movable "in the ordinary course of business."[27] *See Honeyman*, 25 Or 539 (quarry derrick not real property despite attachment by guy ropes); *Henkle*, 15 Or 610 (engine and sawmill not real property despite attachment by bolts and screws); *Saunders*, 300 Or at 390 (finding that Harvestores were "designed to permit removal" despite being bolted to concrete, but finding no evidence that Harvestores were "designed to be moved in the ordinary course of business").

Fourth, taxpayer's subjective intention to move or remove the Compressor System in the future does not control its classification. Objective facts determine whether taxpayer, as the system's original installer, intended to affix it permanently at its present site. The parties have adduced a number of facts relevant to this inquiry, including the time, equipment, and manpower needed to disassemble

---

[27] The court notes the following statement in *Saunders*: "ORS 307.010(1) does not require *permanence*; it only requires that the structure be erected upon or affixed to the land." 300 Or at 390 (emphasis added). Although an intention to "permanently" affix an item to the land is one of the factors in applying the common-law test, the Supreme Court did not otherwise discuss the common-law test. For that reason, this court does not read the sentence in *Saunders* as a direction to reject the common-law test. If anything, the court's citation to *Warm Springs Lumber* on the next page was itself a reliance on the common-law rule that parties' characterization of property by agreement is not binding on taxing authorities or other third parties. *See Saunders*, 300 Or at 390-91.

and move the Compressor System, the manner in which it would be detached from the barn's concrete floor, and taxpayer's installation of the electrical and hydraulic systems. Additional relevant facts would include clearer evidence of the extent to which the hydraulic system is connected to systems in place at the current site, the cost of those systems, the likelihood of finding a suitable alternative site, and detail about the time and expense to improve and prepare the site, including installation of property needed to support the Compression System's hydraulic and electrical systems.

Fifth, under ORS 307.394, the Compressor System must not only fit the definition of "tangible personal property" under ORS 307.020(1)(c); it also must be "designed to be moved in the ordinary course of business." *See Saunders*, 300 Or at 389-90. Evidence relevant to this requirement would include data showing whether and how often buyers of the same or similar items of machinery and equipment move them in the course of their business, including but not limited to moves timed to follow any local cycles of cutting or baling, or of preparation for export. *Cf. Saylor v. Enterprise Electric Co.*, 110 Or 231, 233, 222 P 304 (1924), *reh'g den*, 110 Or 231, 223 P 725 (1924) (describing "custom" of farmers to move hay derricks from field to field and farm to farm). Moves due to extraordinary events such as foreclosure are not relevant. Given the court's reference in *Saunders* to the "design" of the property, evidence showing whether the Compressor System includes features that facilitate disassembly, relocation and reassembly would be relevant as well. Evidence of any need for post-move adjustments and related down time would be relevant, based on the court's observations of mechanical complexity in *Seven-Up Bottling* and *Columbia River Egg Farm*.[28]

---

[28]  The court disagrees with the department's assertion at oral argument that *Columbia River Egg Farm* requires the Compression System to be movable "while in operation." The department's counsel stated that "moved or movable in the ordinary course of business means movement while in operation according to *** the *Columbia River Egg Farm* case." The court reads that case as concluding that a machine that would require extensive down time and adjustment following a move may not be considered movable in the ordinary course of business. However, the court does not believe that machinery that has been held "movable," such as a portable sawmill, must literally be "in operation" while in transport. *See Henkle*, 15 Or at 613-14 (explaining that portable sawmill was often moved

Based on this understanding of the statutes and cases, questions of material fact remain as to the first two issues. The court will therefore deny summary judgment and set the case for trial on those issues.

**B.   *Is the Compression System a "farming implement"?***

Taxpayer argues in the alternative that the Compression System is a "farming implement" under ORS 307.020(1)(c). The court applies the *Gaines* analysis to that term.

**1.   *Text***

Like the term "movable," "farming implements" entered Oregon property tax law in the 1935 act that first defined "tangible personal property." Or Laws 1935, ch 274, § 3 (amending the term "tangible personal property"). The *Webster's* definition of "implement" was:

> "1. An article, as of apparel or furniture, serving to equip; also, a tool, utensil, etc., forming part of equipment for work[.]
>
> "* * * * *
>
> "Syn. – IMPLEMENT, TOOL, UTENSIL, INSTRUMENT agree in suggesting *relatively simple construction and personal manipulation*. IMPLEMENT is the broadest term, frequently implying that by which any operation is carried on; TOOL commonly suggests the implements of a craftsman or laborer[.]"

*Webster's Third* at 1250 (unabridged ed 1934) (emphasis added; boldface omitted). The *Oxford English Dictionary's* definition of "implement" was:

> "1. *Pl.* Things that serve as equipment or outfit, as household furniture or utensils, ecclesiastical vessels or vestments, wearing apparel or ornaments, etc.
>
> "* * * * *
>
> "2. *Pl.* The apparatus, or set of utensils, instruments, etc. employed in any trade or in executing any piece of work; now chiefly in agricultural implements or as a synonym of 'tools'; frequent as a generic term for the tools, weapons, etc. used by savage or primitive man[.]"

---

between uses); *see also Saylor*, 110 Or at 233 (describing hay derricks as "movable implements" that were customarily transported between uses in fields).

*Oxford English Dictionary* at 94 (supplement to first ed 1933) (boldface omitted).

A technical legal meaning existed as of 1935. *Black's* defined "implements" as "such things as are used or employed for a trade, or furniture of a house. *** Whatever may supply wants; particularly applied to tools, utensils, vessels, instruments of labor; as, the implements of trade or of husbandry." *Black's* at 924 (3rd ed 1933). The court sees no substantive difference between the plain and technical meanings. These definitions show that "implement" at that time was synonymous with "tool."

2.  *Context*

Contemporaneous case law is sparse,[29] but a 1924 opinion of the Oregon Supreme Court in a personal injury case describes a "hay derrick" as an "implement" in the context of farm activity:

> "[F]or the purpose of stacking their hay the farmers of the district make general use of movable implements known as hay derricks. In harvesting their crops it was the custom of the farmers in that district to move such derricks from field to field and from farm to farm, through gateways, over the public roads."

*Saylor*, 110 Or at 233. The hay derrick in the case was 19 feet, six inches in height. *Id.* at 238-39. On the date of the injury, the farmer was using "two spans of horses" to drive the hay derrick to another farm. *Id.* at 233. From this usage, this court concludes that an "implement" could include a large and heavy machine. *See also Gillard v. Gillard*, 88 Or 95, 100, 171 P 557 (1918) ("[T]he only way of reaching the summit [of the hill] is by a trail which cattle have made, the path is sufficient to enable *farming implements* to be taken to and from the hill." (Emphasis added.)).

3.  *Conclusion regarding "farm implement"*

The text and context of "farm implement" indicate that the same facts will control as to that term as in the analysis of whether the Compressor System is "movable" or

---

[29] *See Arndt v. Arndt*, 146 Or 347, 352-53, 30 P2d 1 (1934) (listing property in a divorce case: "six cows and two heifers," a tractor, and "other *farming implements* of small value") (emphasis added).

"affixed to the land." In any event, even if the Compression System is a "farm implement," under *Saunders*, the exemption under ORS 307.394 is available only if the Compression System is also "moved or movable in the ordinary course of business" or "designed to be moved in the ordinary course of business." Accordingly, the court does not anticipate a need to decide separately under ORS 307.020(1)(c) whether the term "movable" impliedly modifies "farm implement" in addition to "machinery," "tools," and "equipment." The court will deny summary judgment as to this issue as well.

C.   *Taxpayer's remaining arguments*

Taxpayer makes an additional alternative argument: The Compression System can be classified as personal property because, under ORS 308.875, manufactured structures and mobile homes—which "are built to be occupied and are typically connected to water, sewer, electricity and other utilities through wires and plumbing"—are classified as personal property.[30] The court rejects this argument: The legislature explicitly granted personal property treatment for manufactured structures under certain conditions. Taxpayer never asserts that the Compression System is a manufactured structure and does not point to a statute similar to ORS 308.875 declaring that property such as the Compression System is personal property.

## VII.   CONCLUSION

The stipulated facts and exhibits do not allow the court to determine whether the Compression System is "tangible personal property" or "designed to be moved in the ordinary course of business" based on the legal analysis above. Now, therefore,

IT IS ORDERED that Defendant's Motion for Summary Judgment is denied.

---

[30] Taxpayer also cites one of the department's forms, Form No. 150-303-658, which, according to taxpayer, "provides that 'all manufactured structures are personal property.'" The court is not bound by the department's forms and, regardless, nothing in Form No. 150-303-658 is inconsistent with the department's argument in this case.